UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                    :
IN RE APPLICATION OF MAMMOET SALVAGE,    :
B.V. FOR AN ORDER TO TAKE DISCOVERY FOR    :
USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 :
U.S.C. § 1782                                                       :            23-mc-00073 (LJL)
                                                                    :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _10/28/2025_

OPINION & ORDER

LEWIS J. LIMAN, United States District Judge:

Applicant Mammoet Salvage, B.V. ("Mammoet" or "Petitioner") applies, pursuant to 28 U.S.C. § 1782, for an order permitting it to take discovery for use in foreign proceedings (the "Application") from Citibank, N.A. ("Citibank"), Commerzbank AG ("Commerzbank"), JP Morgan Chase, National Association ("JP Morgan"), Mashreqbank PSC ("Mashreqbank"), MUFG Bank, Ltd. ("MUFG"), Standard Chartered Bank, and UniCredit Bank AG ("UniCredit") (collectively the "Correspondent Banks"). Dkt. No. 2 at 8–9. For the reasons that follow, the Application is granted in part and denied in part.

## BACKGROUND

### A. The Underlying Dispute

During the 1991 Gulf War, a large oil tanker called the Amuriyah was bombed and eventually sank off the coast of Basra, a city in southern Iraq. Dkt. No. 3 ("Morris Decl.") ¶ 4. Years later, as part of its effort to expand the oil terminal in Basra, the Iraqi Ministry of Oil decided it was necessary to remove the Amuriyah wreck from the seabed. *Id.* In 2013, Basra Oil Company ("BOC" or "Intervenor"), a state-owned company controlled by the Iraqi Ministry of Oil and headquartered in Basra Governate, Dkt. No. 31 ¶¶ 5–6, entered into a contract with

Petitioner, a leading company in the salvage industry, to facilitate the removal of the Amuriyah wreck.  Morris Decl. ¶ 5.[1]

Disputes arose between the parties with respect to the agreement, and, in 2018, pursuant to their contract, Petitioner initiated arbitration proceedings in the International Chamber of Commerce International Court of Arbitration ("ICC") against BOC.  Dkt. No. 2 at 2.  BOC filed a Counterclaim against Petitioner in the same court.  *Id.* at 2–3.  At the conclusion of the arbitration, in November 2021, Petitioner obtained an award of $85,014,784 (in addition to interest payments and party costs) against BOC, and BOC obtained an award of $37,738,777 (in addition to interest payments) against Petitioner.  *Id.* at 2–3.  The net result of the awards was that BOC would pay Petitioner $58,758,475 (the "Award"), in addition to interest payments.  *Id.* at 3.

Following the issuance of the Award, Petitioner sought to confirm and enforce the Award, and BOC sought to challenge it.  In the Dubai International Finance Center ("DIFC"), BOC filed an application to set aside the Award.  *Id.* at 3; Dkt. No. 31 ¶¶ 22–23.  That application was rejected by the DIFC Court of First Instance on February 8, 2023.  Dkt. No. 31 ¶ 25.  On November 8, 2024, the DIFC Court of Appeal issued an order dismissing BOC's appeal.  Dkt. No. 77 ("Golendukhin Decl.") ex 1.  In the same court, on March 2, 2023, Petitioner filed *ex parte* proceedings to recognize and enforce the Award.  Dkt. No. 2 at 3; Dkt. No. 31 ¶ 40.  On March 20, 2023, H.E. Justice Shamlan Al Sawalehi issued an Order recognizing the Final Award and allowing its enforcement (the "March 20 Order").  Dkt. No. 31 ¶ 44.  Thereafter, BOC filed an application to have the March 20 Order set aside.  Dkt. No. 31 ¶ 47.  On April 8, 2025, the DIFC Court of First Instance issued an order that the March 20 Order was

---

[1] BOC was formerly known as the South Oil Company.  Morris Decl. ¶ 3.

"final and executory." Golendukhin Decl. ex 2. It thus is undisputed that there is a final Award. Dkt. No. 74 at 25:23. On or about April 17, 2025, the DIFC courts issued a deputation letter to be used for enforcing the March 20 Order in the courts of Dubai. Golendukhin Decl. ¶ 4.

B. <u>The Foreign Proceedings to Enforce and Collect upon the Award</u>

Petitioner has initiated several proceedings to enforce and collect on the Award. Through this Application, Petitioner seeks discovery in relation to these various foreign proceedings. Dkt. No. 76 at 14–17.

1. <u>Netherlands Proceedings</u>

In the Netherlands, Petitioner has sought to enforce the Award by attaching assets of BOC's alleged judgment debtor, Bashneft International B.V. ("Bashneft").[2] Under Dutch law, a creditor or alleged creditor can seek leave for a third-party pre-judgment attachment to secure future collection of a claim and to freeze sums or goods that the third-party garnishee owes the debtor of the creditor. Dkt. No. 33 ("First Verkerk Decl.") ¶ 12. The third-party pre-judgment attachment does not require that the frozen funds be immediately paid by the third-party garnishee to the creditor. *Id.* ¶ 13. Rather, the party that requests leave to levy pre-judgment attachments is required to also initiate proceedings regarding the alleged underlying claim within a specified deadline. *Id.* ¶ 11. If a court renders judgment in favor of the creditor in the underlying proceedings, then the "conservatory garnishment" will be converted into an ordinary attachment, *id.* ¶ 13; if the creditor loses the underlying proceeding, then the creditor will be liable in principle for any damages caused by having wrongfully made attachments or garnishments, *id.* ¶ 13.

---

[2] Petitioner also sought leave to make a conservatory third-party attachment against ENI Iraq B.V. That application was not successful. Morris Decl. ¶ 8.

On or about May 17, 2022, Petitioner filed an *ex parte* Application for Garnishment of Third Parties with the Preliminary Relief Court of the District Court of Amsterdam. *Id.* ¶ 5. Petitioner sought to garnish property against Bashneft and another private limited liability company, ENI Iraq B.V. *Id.* ¶ 7. It did so "[i]n order to avoid any unnecessary costs associated with obtaining enforcement leave if it turns out that there are no assets of BOC that can be used for recourse." *Id.* ¶ 8. On May 18, 2022, a preliminary relief judge granted Petitioner's Third-Party Pre-Judgment Attachment Application and permitted Petitioner to make third-party attachments/garnishment against Bashneft and ENI Iraq, conditioned upon Petitioner seeking to commence recognition and enforcement proceedings within 52 weeks. *Id.* ¶¶ 14, 16. Petitioner served Bashneft and ENI Iraq on or about May 19, 2022. *Id.* ¶ 17; Dkt. No. 78 ("Second Wiersma Decl.") ¶ 3. On July 8, 2022, Bashneft issued a third-party declaration stating that Bashneft owed the "debtor" (BOC) "USD 9,575,022 payable in 2022" pursuant to an Exploration, Development and Production Service Contract. Second Wiersma Decl. ¶ 3, ex 1. On or about September 16, 2024, however, Bashneft sent Petitioner a letter purporting to retract and amend its July 8, 2022 statement and asserting that "Bashneft, at the time that the attachment was levied (as well as today), does not owe anything to [BOC]." Second Wiersma Decl. ¶ 4, ex 2 at 2. It contended that the sums it previously reported as owing to BOC in fact were owed to an Infrastructure Fund of which BOC was neither owner or beneficiary and that BOC did not control or manage. Second Wiersma Decl. ex 2 at 2–3.

On March 7, 2023, Petitioner filed an Application for Recognition and Enforcement of an Arbitral Award before the Amsterdam Court of Appeal pursuant to Articles III and IV of the New York convention and the Dutch statute implementing enforcement of awards rendered outside the Netherlands. First Verkerk Decl. ¶ 27. On February 11, 2025, the Amsterdam Court

of Appeal issued an order granting Petitioner's application for recognition and leave to enforce

the Award and denying BOC's arguments against recognition and enforcement of the Award.

Second Wiersma Decl. ¶ 6, ex 3.  BOC has failed to pay and comply with the Enforcement

Order.  Second Wiersma Decl. ¶ 8.  As a result, on or about February 24, 2025, Petitioner caused

the bailiff to serve the Enforcement Order on Bashneft.  *Id.*  Bashneft has failed to respond to the

bailiff's executionary action of February 24, 2025 or to pay any funds or monies into the bailiff's

escrow account.  *Id.* ¶ 9.

Under Netherlands law, Petitioner now has the right to contest the garnishee declaration

from Bashneft in so-called declaration proceedings under Article 477a (sub 2) of the Dutch Code

of Civil Procedure.  Dkt. No. 46 ("First Wiersma Decl.") ¶ 15; Second Wiersma Decl. ¶ 7.  On or

about May 23, 2025, Petitioner caused a Writ of Summons to be issued for proceedings before

the Amsterdam District Court against Bashneft for the payment of the USD 9,575,022 garnished

and declared in the July 8, 2022 declaration or, in the alternative, to dispute the accuracy and

completeness of Bashneft's amended garnishee declaration of September 16, 2024.  Second

Wiersma Decl. ¶ 10, ex 5.  In that proceeding, the court will determine the due and payable

amount that Bashneft should pay to BOC and establish the accuracy of Bashneft's declarations of

garnishment.  Dkt. No. 84 ("Second Verkerk Decl.") ¶ 12; Second Wiersma Decl. ¶ 12.

2.  French Proceedings

Petitioner also commenced proceedings in France beginning in December 2023.  Dkt.

No. 80 ("Monnerville Decl.") ¶ 5.  On December 5, 2023, and again on September 23, 2024,

counsel for Petitioner carried out precautionary seizures of claims and intangible rights against

French company TotalEnergies EP Ratawi Hub ("Total Ratawi").  *Id.* ¶¶ 5, 8.  In response to the

first precautionary seizure, on December 11, 2023, Total Ratawi declared that an estimated USD

3,100,000 was owed to BOC by Total Ratawi as of the date of the precautionary seizure. *Id.* ¶ 5. On September 26, 2024, in response to the second precautionary seizure, Total Ratawi declared that a term-based obligation for the sum of USD 2,250,000 was owed to BOC by Total Ratawi as of September 23, 2024. *Id.* ¶ 8. In connection with both precautionary seizures, Total Ratawi has failed to comply with summons from the bailiff that it provide supporting documentation, including the underlying contracts with BOC. *Id.* ¶¶ 7, 9. Counsel for Petitioner carried out additional precautionary seizures against Total Ratawi on January 24, 2025, and June 6, 2025. *Id.* ¶¶ 10, 13. In connection with the January 24, 2025 precautionary seizures, Total Ratawi failed to comply with orders of the bailiff to provide supporting documentation. *Id.* ¶ 11. On both occasions, Total Ratawi declared that it did not have any additional payable obligations to BOC. *Id.* ¶¶ 10, 13.

On June 6, 2025, Petitioner caused a claim to be issued under French law for an order that Total Ratawi produce the necessary supporting documentation for its precautionary seizure declarations. *Id.* ¶ 14. Total Ratawi has been summoned to appear before the Enforcement Judge at the Judicial Court of Nanterre. *Id.* ¶ 14. A hearing has been scheduled for November 4, 2025 before the enforcement judge at the Nanterre Judicial Court to answer Petitioner's claims regarding Total Ratawi's failure to comply with its legal obligation to provide the bailiff and Petitioner with the supporting documents. *Id.* ¶ 15.

### 3. Proceedings in Belgium

Under Belgian law, a creditor or alleged creditor can obtain a third-party attachment or garnishment ("conservatory garnishment") to prevent the putative debtor from further disposing of the garnished sums to the detriment of its creditor and thus to secure the future collection by the creditor of its claim against the debtor. Dkt. No. 32 ("Fransis Decl.") ¶ 6. In a conservatory

garnishment under Belgian law, the creditor or alleged creditor instructs the bailiff to levy an attachment on all sums owed by the third-party garnishee to the debtor of the creditor. *Id.* In effect, the garnishment freezes any sums or goods that the third-party garnishee owes to the debtor at the time of the garnishment. *Id.* ¶ 7. Pursuant to a conservatory garnishment, the third-party garnishee has two obligations: (1) it must refrain from disposing of the attached assets; and (2) it must deliver to the creditor (or the bailiff acting on the creditor's behalf), with copy to the seized-debtor, a written declaration stating whether the third-party garnishee is a debtor of the seized-debtor and, if so, for what cause and in what amount. *Id.* ¶ 9. If the third-party garnishee, at the time of the garnishment, is not indebted to the seized-debtor, the garnishment lacks substance and ceases to have effect. *Id.* ¶ 10; Dkt. No. 47 ("First Hansebout Decl.") ¶¶ 7–8. A creditor can challenge the completeness or accuracy of a third-party statement under Belgian law by summoning the third party before the Belgian attachment judgment under Article 1456, paragraph 1 of the Belgian Judicial Code. First Hansebout Decl. ¶ 9. The third-party garnishee will only be required to pay to the bailiff instructed by the creditor once the conservatory garnishment has been converted into an executory garnishment or if a separate executory attachment has been levied. Fransis Decl. ¶ 8.

In Belgium, on or about May 18, 2022, on instruction of Petitioner, a Belgian bailiff levied a conservatory garnishment against BP Iraq BV ("BPI"), a company incorporated under Belgian law. Fransis Decl. ¶ 4. The garnishment was aimed to secure collection of the Award as to which Petitioner was creditor and BOC was debtor. *Id.* ¶ 4. BPI declared in a garnishee declaration of May 30, 2022 that it did not owe any sums or goods to BOC. *Id.* ¶ 11. Petitioner challenged the accuracy, clarity and completeness of the BPI declaration. First Hansebout Decl. ¶ 10; Dkt. No. 79 ("Second Hansebout Decl.") ¶ 4.

As of August 14, 2025, Petitioner had not been able to obtain the evidence to judicially challenge BPI's negative garnishee declaration. *Id.* ¶ 5. The three-year duration of the conservatory attachment expired in May 2025. *Id.* The contemplated Article 1456 action may no longer be timely. *Id.* Instead, petitioner states that should it obtain the evidence necessary to challenge BPI's declaration, Petitioner contemplates using evidence of payments between BPI and BOC in a contemplated tort action in the Courts of Ghent (Belgium) against BPI under Article 1382 of the Belgian Old Civil Code. *Id.* ¶ 6; Dkt. No. 76 at 6–7.

    4. <u>Other Jurisdictions in which Exequatur is Being Sought or Contemplated</u>

Petitioner states that it also seeks discovery for use in other jurisdictions in which exequatur is already being sought or is being contemplated. Dkt. No. 76 at 17. However, it does not identify any such jurisdictions.

C. <u>The Present Application</u>

Petitioner filed this application on March 21, 2023. Dkt. No. 1. Petitioner seeks documents from seven banks, each of which Petitioner believes possesses documents containing important information concerning BOC's assets and transactions. Dkt. No. 2, at 5–6. Those banks are: Citibank, JP Morgan, Commerzbank, Mashreqbank, MUFG, Standard Chartered Bank, and UniCredit. Dkt. No. 1. Each of the seven banks is a correspondent bank of the Trade Bank of Iraq ("TBI"), which was established by the Coalition Provisional Authority in July 2003 as an independent government entity to provide financial services to facilitate import and export of goods and services to and from Iraq.[3] Dkt. No. 2 at 4; Morris Decl. ¶ 11. Petitioner states that

---

[3] Citibank and JP Morgan are correspondent banks for TBI for U.S. dollar-denominated payments. Morris Decl. ex 2. Commerzbank and UniCredit are correspondent banks for TBI for euro-denominated payments. *Id.* Mashreqbank is a correspondent bank for Emirati Dirham-denominated payments. *Id.* MUFG is a correspondent bank for TBI for Japanese yen-denominated payments. *Id.* Standard Chartered Bank is a correspondent bank for TBI for

the correspondent banks permit TBI's clients to conduct international transfers. Dkt. No. 2 at 5. Petitioner also states, "on information and belief," that TBI performs all transactions by Iraqi state-owned entities and that TBI "plays a vital role in international transfers by entities such as BOC." *Id*. BOC does not dispute that it has an account with TBI, does some transactions through TBI, and, to the extent it does international transactions, TBI would be involved. Dkt. No. 74 at 29:21–24.

Petitioner seeks documents from these banks that would shed light on "information relating to transfers to or from BOC" that the banks may have due to their function as correspondent banks of TBI. Dkt. No. 2 at 9. By obtaining the documents, Petitioner aims to ascertain the location of BOC's accounts; the location of BOC's assets; information regarding the identities and locations of BOC's trading partners; whether BOC has conveyed assets in order to evade execution or pursue fraudulent conveyance; and whether BOC is using other entities or trading partners to evade execution. *Id*. at 10.

Petitioner submitted template subpoenas in connection with its initial application. The subpoenas would require production of the following documents in the possession, custody or control of the Correspondent Banks:

1. Any orders, instructions or wire transfers received from any person or entity (including but not limited to, any payor/transferor bank to a payee/transferee bank) for the benefit or credit of Basra Oil Company in which [the Correspondent Bank] has acted as either as direct transfer bank or as the intermediary or correspondent bank, together with any electronic and/or paper records thereof for the period beginning December 2013 to the present.

2. Any documents relating to any account owned by Basra Oil Company or for which it was an authorized signer for the period beginning December 2013 to the present.

3. Any loan documents, including loan applications, submitted by or on behalf of Basra Oil Company for the period beginning December 2013 to the present.

---

Japanese yen-denominated payments and British-pound denominated payments. *Id.*

Dkt. No. 2 at 21.

The Court held oral argument on the application on July 22, 2025.  Dkt. No. 74.

Following argument, Petitioner supplemented and amended its application to seek from the

Correspondent Banks only evidence regarding payments and transfers for the benefit or credit of

BOC that were either denominated in United States dollars or which were processed using

United States dollars as an intermediary currency.  Dkt. No. 76 at 19–20.  Accordingly, the

revised request demands as follows:

> This subpoena requires production of all documents that are responsive to the
> requests [sic] below and are in your possession, custody or control:
> 1.  Any orders, instructions or wire transfers, denominated in U.S. dollars or for
>     which the U.S. dollar was an intermediary currency, received from any person
>     or entity (including but not limited to, any payor/transferor bank to a
>     payee/transferee bank) for the benefit or credit of Basra Oil Company in
>     which [the Correspondent Bank] has acted as either as direct transfer bank or
>     as the intermediary or correspondent bank, together with any electronic and/or
>     paper records thereof for the period beginning December 2013 to the present.

Dkt. No. 76 at 22.

## PROCEDURAL HISTORY

Petitioner filed this Section 1782 application on March 21, 2023.  Dkt. No. 1.  On May

10, 2023, BOC filed a motion to intervene, Dkt. No. 28, which was unopposed, Dkt. No. 49, and

ultimately granted, Dkt. No. 63.  Also on May 10, 2023, BOC filed its opposition to Petitioner's

Section 1782 application.  Dkt. No. 30.  On May 25, 2023, Petitioner filed a reply memorandum

of law in support of its motion.  Dkt. No. 44.   At the time the Application was filed, BOC's

appeal was still pending in the DIFC and the order had not yet been recognized as final.

In February 2025, the case was reassigned to the undersigned.  Dkt. No. 61.  Upon the

reassignment, the Court asked the parties to submit a joint letter informing the Court of important

updates in the foreign proceedings that may have occurred in the period since the parties filed

their briefs. *Id.* On March 3, 2025, the parties submitted the joint letter, informing the Court that one of the proceedings for which Petitioner sought documents through Section 1782 discovery—the Amsterdam Court of Appeals' review of a lower court's confirmation of the Award—had concluded, with the court affirming the recognition of the Award and granting leave to enforce it. Dkt. No. 62. On July 22, 2025, the Court heard oral argument. Dkt. No. 74.

Following oral argument, Petitioner submitted a supplemental memorandum of law in further support of the Section 1782 application. Dkt. No. 76. It also submitted declarations in support of the application. Dkt. Nos. 77–80. Petitioner also filed a separate memorandum of law in support of the application to take discovery from Standard Chartered Bank. Dkt. No. 81. On September 4, 2025, BOC submitted a supplemental memorandum of law in opposition to the motion along with declarations of James Lloyd Loftis and Remme Verkerk. Dkt. Nos. 82–84. Petitioner submitted a reply memorandum of law in further support of the application and the declaration of Taco Wiersma on September 11, 2025. Dkt. Nos. 85–86.

## DISCUSSION

"The analysis of a district court hearing an application for discovery pursuant to § 1782 proceeds in two steps." *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 148 (2d Cir. 2022).

First, to be entitled to relief under Section 1782, applicants "must meet several statutory requirements, including that '(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person.'" *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 97 (2d Cir. 2020) (quoting *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir.

2015)); *see In re BonSens.org*, 95 F.4th 75, 79 (2d Cir. 2024).[4]  If an application fails on the

statutory requirements, the district court need not evaluate the discretionary factors.  *See id.* at 81

("Having concluded that the district court did not err in determining that the 'for use'

prerequisite was not met, we can identify no abuse of discretion in the district court's decision to

forgo consideration of the *Intel* factors.").

Second, "[o]nce the statutory requirements are met, a district court may order discovery

under § 1782 in its discretion, taking into consideration the 'twin aims' of the statute, namely,

'providing efficient means of assistance to participants in international litigation in our federal

courts and encouraging foreign countries by example to provide similar means of assistance to

our courts.'"  *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117

(2d Cir. 2015) (quoting *In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997)); *see In re Pub.*

*Joint-Stock Co. Bank Otkritie Fin. Corp.*, 2023 WL 4928227, at *2 (S.D.N.Y. Aug. 2, 2023).

The Supreme Court has set forth four factors for the Court to consider in the exercise of

its discretion:

> (1) whether "the person from whom discovery is sought is a participant in the
> foreign proceeding,"
>
> (2) "the nature of the foreign tribunal, the character of the proceedings underway
> abroad, and the receptivity of the foreign government or the court or agency
> abroad to U.S. federal-court judicial assistance,"
>
> (3) whether "the § 1782(a) request conceals an attempt to circumvent foreign
> proof-gathering restrictions or other policies of a foreign country or the United
> States," and
>
> (4) whether the requested discovery is "unduly intrusive or burdensome."

---

[4] Additionally, the statute requires that the discovery not be "in violation of any legally applicable
privilege."  28 U.S.C. § 1782(a); *see In re Guo*, 965 F.3d 96, 102 n.3 (2d Cir. 2020).

*BonSens*, 95 F.4th at 80 (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004)).

"[T]he *Intel* factors provide a district court with a useful guide by which to assess whether to exercise its discretion to grant a section 1782 application." *In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at *9 (S.D.N.Y. July 9, 2021). Further, the factors "are not to be applied mechanically [and a] district court should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018); *see also In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, 2025 WL 40783, at *2 (S.D.N.Y. Jan. 7, 2025) (stating that *Intel* factors are "neither exhaustive nor dispositive" and are not to be applied mechanically) (quoting *Matter of Ord. Seeking Discovery Under 28 U.S.C. § 1782*, 2024 WL 3569022, at *3 (S.D.N.Y. July 12, 2024), *report and recommendation adopted by* 24-mc-152, ECF No. 22 (S.D.N.Y. July 29, 2024)); *Matter of Hranov*, 2024 WL 2193866, at *7 (S.D.N.Y. May 15, 2024), *aff'd sub nom. Hranov v. Deutsche Bank AG*, 2025 WL 573727 (2d Cir. Feb. 21, 2025) (considering other pertinent issues). At the same time, however, "courts are 'not free to read extra-statutory barriers to discovery into section 1782' under the guise of exercising their discretion.'" *Fed. Republic of Nigeria*, 27 F.4th at 148 (quoting *Application of Gianoli Aldunate*, 3 F.3d 54, 59 (2d Cir. 1993)).

## I.   Statutory Factors

### A.   Residence in District

Section 1782 discovery may only be sought from a federal district court in "the district in which a person resides or is found." 28 U.S.C § 1782. BOC argues that the application should be denied because the Correspondent Banks, with the exception of Citibank, do not reside and cannot be found in this District, Dkt. No. 82 at 6–9, and the discovery that Petitioner seeks is not

"for use" in a foreign proceeding or before an international tribunal, *id.* at 9–16.  BOC does not

dispute that Citibank can be found in this District.  *Id.* at 6.

The reach of Section 1782 "extends to the limits of personal jurisdiction consistent with

due process."  *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019).  A person thus resides or is

found in a District where it is subject to personal jurisdiction.  "Personal jurisdiction takes two

forms: general jurisdiction and specific jurisdiction."  *Suez Water N. Y. Inc. v. E.I. du Pont de*

*Nemours & Co.*, 578 F. Supp. 3d 511, 527 (S.D.N.Y. 2022).

A corporation is subject to general jurisdiction when its "affiliations with the State are so

"continuous and systematic" as to render [it] essentially at home in the forum State."  *Daimler*

*AG v. Bauman*, 571 U.S. 117, 139 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v.*

*Brown*, 564 U.S. 915, 919 (2011)).  "With respect to a corporation, the place of incorporation

and principal place of business are paradigm bases for general jurisdiction."  *Id.* at 137 (internal

quotations omitted).

A court may exercise specific jurisdiction over a defendant and therefore a discovery

subject may be found in this district if "the individual or entity has 'purposefully directed his

activities at the forum and the litigation arises out of or relates to those activities.'"  *del Valle*

*Ruiz*, 939 F.3d at 529 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)

(cleaned up)), and if the assertion of personal jurisdiction would "comport with fair play and

substantial justice," *id*. (quoting *Burger King*, 471 U.S. at 476).  The *del Valle Ruiz* court held

that "some causal relationship [is required] between an entity's in-forum contacts and the

proceeding at issue."  939 F.3d at 530.  In the ordinary case, "the respondent's having

purposefully availed itself of the forum must be the primary or proximate reason that the

evidence sought is available at all."  *Id.*  "[W]here the respondent's contacts are broader and

more significant," a petitioner must still demonstrate "that the evidence sought would not be available *but for* the respondent's forum contacts." *Id*. (emphasis added).

The decision in *del Valle* Ruiz predated the Supreme Court's decision in *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021), in which the Supreme Court rejected any strict causal requirement read into the "arise out of or relate to" language derived from *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). *See Ford*, 592 U.S. at 352 (holding that the "causation-only approach finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities"). After *Ford Motor Co.*, the personal jurisdiction a court may exercise "consistent with due process," *del Valle Ruiz*, 939 F.3d at 528, is no longer limited by the "causal relationship" requirement. That "does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford*, 592 U.S. at 362. "Under *Ford*, specific personal jurisdiction still requires a 'relationship among the defendant, the forum, and the litigation,' or stated alternatively, a 'connection between the plaintiffs' claims and defendant's activities in those states." *Bah v. Apple Inc.*, 2021 WL 4894677, at *2 (S.D.N.Y. July 26, 2021) (quoting *Ford*, 592 U.S. at 371) (cleaned up); *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 179 (S.D.N.Y. 2021) ("In other words, while it is not necessary that the contacts be causally related to a claimant's claims, they still must be related to these claims in some less than trivial way if the words 'relate to' are to have any real meaning.").

    1.  <u>JP Morgan Chase Bank, N.A.</u>

Petitioner argues that the Court has general jurisdiction over JP Morgan and therefore that it is 'found' in this District because its principal place of business is New York. Dkt. No. 76

at 11.  It has described that its New York City offices in Manhattan are its "Corporate

Headquarters" in communications with regulators, its key corporate officers and Board chair

operate out of New York, New York, it submits SEC filings from this District, and its parent

holding company is located in New York where it employs thousands of employees.  *Id.* at 7–8,

11.  A number of courts in this Circuit have held (sometimes without dispute) that JP Morgan is

"found" in this District.  *See In re Resource Int'l Holdings CV*, 2025 WL 1360893, at *2, *4

(S.D.N.Y. May 9, 2025); *In re Golden Meditech Holdings Ltd.,* 2024 WL 5247285, at *1 n.1 &

*3 (S.D.N.Y. Dec. 30, 2024); *In re West African Mineral Trading Ltd.*, 2024 WL 3862293, at *2

(S.D.N.Y. 2024); *In re Litasco SA*, 2023 WL 8700957, at *1 (S.D.N.Y. 2023); *In re Aso*, 2019

WL 2345443, at *3 (S.D.N.Y. June 3, 2019).

　　　　BOC claims that JP Morgan is not found in this District.  JP Morgan is a national bank

that describes its "main office" as being located in Columbus, Ohio.  Dkt. No. 30 at 13.  JP

Morgan's Registration Statement on Form S-3 indicates that its principal executive offices are in

Columbus, Ohio, Dkt. No. 35-1, and its Articles of Association indicate that its "main office" is

in Columbus, Ohio, Dkt. No. 35-2.  Its "corporate address" as listed on the Office of the

Comptroller of the Currency is Columbus, Ohio, Dkt. No. 35-3, and its "main office" as reflected

on the Federal Deposit Insurance Corporation's web page is also Columbus, Ohio, Dkt. No.

35-4.  BOC relies on two out of Circuit decisions that hold that JP Morgan is subject to general

jurisdiction only in Ohio in which its main office, as set forth in the articles of association, is

located, *see Project Stewart LLC v. JPMorgan Chase Bank, N.A.*, 2022 WL 971478, at *3 (W.D.

Wash. Mar. 31, 2022); or that hold simply that it is not subject to general jurisdiction in

Pennsylvania where it is neither incorporated nor has its principal place of business, *see First

Nat'l Bank of Penn. v. Transamerica Life Ins. Co.*, 2016 WL 520965, at *4 (W.D. Pa. Feb. 10,

2016).  It also relies upon *Beck v. Metro. Bank Holding Corp.*, 2024 WL 2813233, at *11 (E.D.N.Y. June 3, 2024), which holds that JP Morgan is not a citizen of New York for purposes of diversity jurisdiction.

BOC's argument is predicated on an asserted equivalence between "citizenship" for purposes of diversity jurisdiction under 28 U.S.C. §§ 1332 and 1348 and residence and personal jurisdiction under *Goodyear* and *Daimler*.  Section 1348 of Title 28 provides in relevant part that for purposes of diversity jurisdiction "[a]ll national banking associations shall . . . be deemed citizens of the States in which they are respectively located."  28 U.S.C. § 1348.  In *Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006), the Supreme Court, construing that language, held that, for diversity jurisdiction purposes, a national bank, is "located" in and "is a citizen of the State in which its main office, as set forth in its articles of association, is located," and not of each State in which it has branch operations.  *Id.* at 307.  The Court left open the question whether a national banking association should be "deemed a citizen of both the State of its main office and the State of its principal place of business," noting that the distinction "may be of scant practical significance for, in almost every case, . . . the location of a national bank's main office and of its principal place of business coincide." *Id.* at 317 n.9.  In *OneWest Bank, N.A. v. Melina*, 827 F.3d 214 (2d Cir. 2016), the Second Circuit, joining other Circuits, answered that question, holding that for purposes of diversity jurisdiction "a national bank is a citizen only of the state listed in its articles of association as its main office."  *Id.* at 219.

The Supreme Court's decision in *Wachovia Bank* and the Second Circuit's decision in *OneWest Bank* do not control the question of general jurisdiction and, in turn, whether JP Morgan is found in this District for the purposes of Section 1782.  The Supreme Court and the Second Circuit were interpreting the language of a statute, 28 U.S.C. § 1348.  That is express in

17

the Second Circuit decision where the court held that its conclusion that citizenship for diversity purposes was "consistent with both the statutory history of § 1348 and canons of construction." *Id.* at 219. The Court recognized that, for purposes of "parity with state banks and other state-incorporated entities," a national bank would have to be deemed a citizen of the State of its principal place of business as well as that of its main office. *Wachovia*, 546 U.S. at 317 n.9. However, "[a]t the time that Congress employed the word 'located' in § 1348, the statutory concept of 'principal place of business' had not yet come into existence." *OneWest Bank*, 827 F.3d at 220. "Congress did not adopt the principal place of business test for state-chartered corporations until 1958." *Rouse v. Wachovia Mortg., FSB*, 747 F.3d 707, 714 (9th Cir. 2014). Before then, "state-chartered banks and other corporations were citizens of *only* the state by which they had been incorporated." *Id.*; *cf. Hertz Corp. v. Friend,* 559 U.S. 77, 88 (2010) (recounting that "principal place of business" language was adopted in 1958). Thus, the Second Circuit, along with other courts, has concluded as a matter of statutory interpretation that a national bank must be deemed to be "located" in the state of its main office for purposes of Section 1348. To hold otherwise and to conclude that a national bank is a citizen also of the State of its principal place of business under Section 1348 would be to "import a jurisdictional concept into § 1348 that was unknown at the time of its adoption." *Wells Fargo Bank, N.A. v. WMR e-PIN, LLC*, 653 F.3d 702, 709 (8th Cir. 2011); *see OneWest Bank*, 827 F.3d at 220.

Section 1348 passed in 1948 to address the State for which a national bank should be deemed to be a citizen for purposes of diversity jurisdiction does not provide the measure of where a national bank can be subject to general personal jurisdiction without violating the due process clause of the Fourteenth Amendment.[5] *Cf. Wachovia Bank*, 559 U.S. at 318 ("'located'

---

[5] The parties assume, and therefore so does the Court, that the Section 1782 requirement that

… is a chameleon word; its meaning depends on the context in and purpose for which it is used"). The determination of "citizenship" for purposes of diversity jurisdiction under Section 1348 is a matter of statutory interpretation. Congress has the power to "confer diversity jurisdiction upon the federal courts . . . and, in doing so, to determine the scope of the federal courts' jurisdiction within constitutional limits." *Hertz Corp.*, 559 U.S. at 84. That Congress chose nearly 75 years ago to make national banks a citizen only of the state of their main office (and thereby to permit them to avail themselves of diversity jurisdiction when sued or suing a citizen of the State in which their principal place of business was located) says nothing about whether the Constitution would permit them to be sued where their principal executive offices are located and from which instructions to other parts of the business radiate.

The Supreme Court has held that a corporation is at home and subject to personal jurisdiction both in the state of its incorporation and in the state of its principal place of business. *Goodyear*, 564 U.S. at 924 (citing a corporation's state of incorporation and principal place of business as paradigmatic bases for general jurisdiction); *Daimler*, 571 U.S. at 137. The Supreme Court also has held that a corporation's "principal place of business is the nerve center from which it radiates out to its constituent parts and from which its offices direct, control and

---

respondents are "found" in the district is defined by the limits of personal jurisdiction under the Fourteenth Amendment. Neither party argues that, given that JP Morgan enjoys its existence from a federal charter and that petitioner is suing under a federal statute, the Court should evaluate this requirement with respect to JP Morgan under the due process clause of the Fifth Amendment. The Court therefore has no occasion to address whether the appropriate question is whether JP Morgan is subject to jurisdiction in New York under the due process clause of the Fifth Amendment. *See Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 12, 16 (2025) (holding that the Fifth Amendment and not the Fourteenth Amendment defines the jurisdictional authority of the federal court when personal jurisdiction is authorized by a federal statute and declining "to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment"). As the Supreme Court suggested that personal jurisdiction is broader under the Fifth Amendment, this question would not change the outcome here. *Id.* at 16.

coordinate all activities without regard to locale, in furtherance of the corporate objective."

*Hertz Corp*, 559 U.S. at 89–90 (quoting *Scot Typewriter Co. v. Underwood Corp.*, 170 F. Supp.

862, 865 (S.D.N.Y. 1959) (Weinfeld, J.)); *see also Daimler*, 571 U.S. at 760 (citing *Hertz Corp.*

with approval for its definition of principal place of business).  Private corporations and state-

incorporated banks thus can be sued in the state where they maintain their principal place of

business consistent with the due process clause.  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619,

627 (2d Cir. 2016) (absent an exceptional case, "a corporate defendant may be treated as

'essentially at home' only where it is incorporated or maintains its principal place of business—

the 'paradigm' cases").  Neither a state-incorporated bank nor a private corporation can shield

itself from personal jurisdiction in the place where its business is principally conducted by the

expedient of incorporating in a location far away.  *See e.g.*, *Penta Hardware Co. v. Masco Corp.*,

2010 WL 2835555, at *2 (S.D.N.Y. July 12, 2010) (defendant is subject to personal jurisdiction

where principal place of business is located, even though defendant is incorporated in a different

state).

    The same principles apply, almost *a fortiori*, with respect to a national bank which does

not owe its existence to the laws of any State but to the laws of the United States.  *See Excelsior*

*Funds, Inc. v. JP Morgan Chase Bank, N.A.*, 470 F. Supp. 2d 312, 322–23 (S.D.N.Y. 2006)

("National banking associations, which are federally chartered entities, are not incorporated by

'any State.'") (citing *Wachovia Bank*, 546 U.S. at 306).  Regardless of the location it lists in its

Articles of Association as its main office, a national bank can be sued in the state where it

maintains its principal place of business, as defined in *Hertz Corp.*, consistent with the due

process clause.  *See Forsburg v. Wells Fargo & Co.*, 596 F. Supp. 3d 572, 581 (W.D. Va. 2022)

(holding that allowing an exception from the *Hertz Corp.* framework for national banks would

20

run afoul of the principal underlying the Supreme Court's decision in *Wachovia Bank* that "national banking associations should not be treated differently than other corporate bodies for jurisdictional purposes") (quoting *Urista v. Wells Fargo & Co.*, 2022 WL 104278, at *4 (S.D. Cal. Jan. 11, 2022) (citing *Wachovia Bank,* 546 U.S. at 307)); *see also Healy v. Wells Fargo Bank, N.A.*, 2022 WL 104733, at *4 (S.D. Cal. Jan. 11, 2022).  Indeed, any other result would be anomalous, cloaking a national corporation with protection from jurisdiction under the due process clause that would not be enjoyed by a state bank or a small private corporation.

JP Morgan's Articles of Association list its main office as located in Columbus, Ohio, Dkt. No. 35-3, but its principal place of business is in New York, New York.  As cited by petitioner, JP Morgan considers its Manhattan offices as its "Corporate Headquarters"—its key corporate officers and Board chair operate out of these offices, and it submits SEC filings from New York, New York.  *Id.* at 7–8, 11.  Its Manhattan offices are properly considered the bank's "nerve center."  *Hertz Corp*, 559 U.S. at 90.  JP Morgan therefore is "found" in this District for purposes of Section 1782.

### 2. The Foreign Correspondent Banks

Petitioner argues that Commerzbank, Mashreqbank, Standard Chartered Bank, MUFG and UniCredit (the "Foreign Correspondent Banks") are subject to specific personal jurisdiction in New York and thus are found in this District under the Application, as revised, because it seeks only "orders, instructions or wire transfers, denominated in U.S. dollars or for which the U.S. dollar was an intermediary currency."  Dkt. No. 76 at 13, 22; Dkt. No. 81 at 2–3.

As previously stated, the determination whether a particular person is "found" in this District for purposes of Section 1782 depends upon the relationship between the discovery being requested and the person's in-jurisdiction activities.  In the framing of *del Valle Ruiz*, a Section

1782 respondent is found in this District when "the respondent's having purposefully availed itself of the forum [is] the primary or proximate reason that the evidence sought is available at all," or if "the respondent's contacts are broader and more significant," if "the evidence sought would not be available *but for* the respondent's forum contacts."  939 F.3d at 530 (emphasis added).  In *Ford Motor Co.*'s more generous phrasing, personal jurisdiction exists if there is "connection between the plaintiffs' claims and [defendant's] activities in those States."  *Ford*, 592 U.S. at 369, 371.

Petitioner has established that there is such a connection between the documents requested of Commerzbank, Mashreqbank, Standard Chartered Bank, and MUFG (collectively, "Participating Foreign Correspondent Banks") and the banks' activities in the District, but has not established a sufficient connection regarding UniCredit.

Petitioner has established that each of the Participating Foreign Correspondent Banks maintains a branch office in New York, New York and that each bank is a member of the Clearing House Interbank Payment System (CHIPS) network.  Morris Decl. ¶ 15–19; Golendukhin Decl. ex 3.  The CHIPS network is "a privately operated automated clearing facility, which is run by the New York Clearing House, for dollar transfers arising from international transfers."  37 The Law of Electronic Fund Transfer Systems § 11.01 (2025). These transactions include both dollar-denominated transactions and transactions where the dollar is used as an intermediary currency.  *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 250 (2018). The CHIPS network "handles about 90 percent of all international interbank transfers relating to dollars."  Jerold A. Friedland, *Understanding International Business and Financial Transactions* 63 (4th ed. 2014).  As stated by the Second Circuit, "New York remains 'the national and

international center for wholesale wire transfers.'"  *Spetner v. Palestine Investment Bank*, 70

F.4th 632, 642 (2d Cir. 2023).

CHIPS previously required that all participant banks "maintain their primary connection

to the CHIPS computer from an office physically located in New York City."  Brief of the N.Y.

Clearing House Assoc. and the Inst. of Int'l Bankers as Amici Curiae Supporting Reversal,

*Citibank, N.A. v. Wells Fargo Asia Limited*, 495 U.S. 660 (1990), 1989 WL 1126983, at *7

(citing to Rule 6 of the Rules Governing the Clearing House Interbank Payments System (as

amended Jan. 25, 1989)).  Currently, Rule 6(a) of the CHIPS system requires that the

participant's electronic connection to the system be located in the United States, without

specifying New York.  CHIPS Rules and Administrative Procedures, Effective April 21, 2025,

https://www.theclearinghouse.org/ payment-systems/CHIPS/CHIPS-Resources ("CHIPS

Rules").  Though no longer required, participants in CHIPS generally conduct CHIPS

transactions through a branch office or correspondent bank in New York City.  Brief of Inst. of

Int'l Bankers as Amicus Curiae Supporting Respondents, *Jesner v. Arab Bank, PLC*, 584 U.S.

241 (2018), 2017 WL 4325882, at *11–12.  The CHIPS system remains centralized in New York

City and requires participants to maintain an account at the Federal Reserve Bank of New York

(described as "Funding Participants") or designate another participant to do so as its Funding

Participant.  CHIPS Rule 12(a)(1)–(2).

In *Spetner*, which concerned a claim under the Anti-Terrorism Act (ATA), the Second

Circuit found it could exercise personal jurisdiction over a foreign bank, Palestine Investment

Bank (PIB), with no physical ties to New York nor any correspondent banking accounts of its

own because it maintained a "nested" correspondent bank account, through the Arab Jordan

Investment Bank, with three New York banks.  70 F.4th at 637–38.  Using the nested accounts, it

could "process dollar-based transactions." *Id.* at 638. The plaintiffs in *Spetner* alleged that PIB

used these nested correspondent bank accounts to process fund transfers in U.S. dollars for

terrorist organizations. *Id.* at 645. The Circuit found that PIB's "contact with New York was not

random or fortuitous but sufficiently purposeful" to satisfy both New York's long-arm statute

and due process. *Id.* at 642, 645. The Circuit evaluated whether the bank's contacts "indicated

'a lack of coincidence' and a desire to benefit from New York's 'dependable and transparent

banking system.'" *Id.* at 640 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732

F.3d at 168, 171 (2d Cir. 2013)). The court concluded that the PIB was not "simply transacting

in U.S. dollars" but had chosen "to avail itself of the benefits of the New York financial system."

*Spetner*, 70 F.4th at 643.

The Participating Foreign Correspondent Banks, though headquartered abroad, have done

much more to avail themselves of the U.S. financial system than the PIB in *Spetner*. They do not

just "transact[] in U.S. dollars" via correspondent banking relationships, *id.*, they established a

physical presence in New York to act as a  correspondent for foreign financial institutions like

TBI. They have chosen to maintain a New York branch and become CHIPS participants in order

to participate in the New York financial system and gain access to efficient U.S. dollar-

denominated transactions. They derive business from foreign partners like TBI on the basis that

they can facilitate their dollar transactions. Thus, there can be little question, that they have

engaged in purposeful contacts with New York in order to facilitate financial transactions. The

banks' use of New York banking facilities is related to the discovery sought by Petitioner, as it is

"the primary or proximate reason that the evidence sought is available at all." *del Valle Ruiz*,

939 F.3d at 530. Petitioner seeks documents from each bank regarding dollar-denominated

transactions or transactions where the dollar is used as an intermediary currency that involved

BOC and where the bank acted as the direct transfer, intermediary, or correspondent bank. Dkt. No. 76 at 22. Thus, there is a nexus between the forum contacts (a branch office in this District and participation in a New York system conducting dollar-denominated transactions or transactions where the dollar is used as an intermediary currency) and the material sought through discovery (records of such transactions related to BOC).[6] *See Pfaff v. Deutsche Bank AG*, 2020 WL 3994824, at *10 (S.D.N.Y. July 15, 2020) (finding personal jurisdiction over bank that conducted trades over a New York exchange where discovery material sought was largely related to that exchange).

It is immaterial on the facts here that Petitioner has not identified specific records in the possession of the Participating Foreign Correspondent Banks. Petitioner need not identify any specific transactions between the Participating Foreign Correspondent Banks and TBI through their New York branches. Petitioner has offered a reasonable basis to presume that the Participating Foreign Correspondent Banks would have responsive records and that their request is not just a hunting expedition. BOC has engaged in international transactions, Dkt. No. 74 at 16:25–17:1, TBI acted as BOC's agent with respect to those transactions, *Id.* at 29:21–24, and many of those transactions would not have been denominated in Iraqi Dinar but in U.S. dollars, the reserve currency of the world (or at least that currency would have been used as an

---

[6] *In re Golden Meditech Holdings Ltd.*, 2024 WL 1349135 (S.D.N.Y. Mar. 29, 2024), relied on by BOC, is inapposite. Petitioner there similarly sought wire transfers related to defendants in a foreign proceeding. However, instead of identifying banks used by those defendants, the petitioner sought documents from banks "commonly known to act as correspondent, intermediary, or otherwise clearing house banks for wire transfers passing between domestic banks and international banks." *Id.* at *1. Therefore, the petitioner's assertion that the respondent banks conducted dollar-denominated wire transfers from New York branches was insufficient to establish a connection between the banks and discovery sought regarding the foreign defendants. In contrast, here, Respondents are correspondent banks with TBI, which conducts BOC's international transactions. Morris Decl. ex 2; Dkt. No. 74 at 29:21–24.

intermediary currency).  *See* Second Wiersma Decl. ex 1 (demonstrating international transaction

with BOC denominated in U.S. dollars); Monnerville Decl. ex 4 (same).  It is reasonable to

assume from the Participating Foreign Correspondent Banks' maintenance of a New York

branch and their membership in CHIPS that these transactions were processed in New York.  In

the Section 1782 context, where petitioner seeks discovery of transactions and bank records,

courts have found a sufficient basis for personal jurisdiction where the respondent banks

"maintain offices in this District where they act as correspondent or intermediary banks for U.S.

dollar-denominated wires transfers involving international banks." *In re Marinakis*, 2025 WL

696769, at *4 (S.D.N.Y. Feb. 21, 2025), *report and recommendation adopted by* 2025 WL

693147 (Mar. 4, 2025);  *see In re SPS I Fundo de Investimento de Acoes – Investimento No

Exterior*, 2024 WL 917236, at *3 (S.D.N.Y. Mar. 4, 2024) (finding that the court has specific

personal jurisdiction over bank "because the documents sought from the amended application

resulted from the correspondent banking services Barclays NY provides from New York"); *In re

Martinez*, 2024 WL 5402058, at *2 (S.D.N.Y. Nov. 1, 2024), *report and recommendation

adopted by* 2025 WL 2505471 (S.D.N.Y. Sept. 2, 2025) (finding specific personal jurisdiction

where subpoena seeks discovery of transactions from bank's New York branch and specifically

rejecting requirement for applicant to identify specific bank accounts or transactions).

     As UniCredit is not a CHIPS participant, the analysis differs.  To connect UniCredit's

New York branch to the discovery sought, Petitioner states that banks who are not participants in

CHIPS may still utilize the CHIPS system through a correspondent bank account with a CHIPS

participant.  Dkt. No. 76 at 12 n.2.  However, Petitioner has not identified a correspondent bank

account through which UniCredit could participate in the CHIPS system or even alleged that

UniCredit has utilized CHIPS through a correspondent bank account.  The most Petitioner is able

to say is that UniCredit "*may* have transacted transfers" to and from TBI from its New York branch. Dkt. No. 44 at 3 (emphasis added). Such an equivocal assertion cannot serve as the only connective allegation supporting personal jurisdiction. *See Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 F. App'x 768, 769 (2d Cir. 2014) (to establish that personal jurisdiction exists, a plaintiff "must make allegations establishing jurisdiction with some factual specificity and cannot establish jurisdiction through conclusory assertions alone") (summary order); *In re Litasco SA*, No. 23 Misc. 354, 2023 WL 8700957, at *2 (S.D.N.Y. Dec. 15, 2023) ("Litasco says that respondents (i) perform correspondent banking services and (ii) have offices here. But it fails to identify the relationship between the two . . . That is not enough.").

Therefore, Citibank, JP Morgan, and the Participating Foreign Correspondent Banks are found within the District. UniCredit is not found within the District.

## B. For Use in a Foreign Proceeding

The statutory prerequisite that the discovery be "for use in a foreign proceeding" "assesses 'the practical ability of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal.'" *BonSens*, 95 F.4th at 80 (quoting *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017) (emphasis in original). This is not a particularly onerous standard as the applicant must demonstrate merely that the information is "minimally relevant to the foreign proceeding." *Id.* "[S]o long as a [§] 1782 applicant has establish[ed] that it will have some means of actually using the evidence in the foreign proceeding, in the absence of authoritative proof that a foreign tribunal would reject the evidence obtained, a district court should not reject a Section 1782 application" for failure to satisfy the "for use" ground. *In re Noguer*, 2019 WL 1034190, at *2 (S.D.N.Y. Mar. 5, 2019) (internal quotation marks and citations omitted); *see also Union Fenosa Gas, S.A. v. Depository Trust Co.*, 2020 WL 2793055, at *4 (S.D.N.Y. May 29, 2020).

Petitioner argues that the requested discovery is for use in connection with the proceedings in (i) the DIFC; (ii) the Netherlands; (iii) France; (iv) Belgium; and (v) other jurisdictions in which exequatur is or may be sought.  Dkt. No. 76 at 3–7, 14–18.  BOC disputes that the requested evidence would be "for use" in any foreign proceeding.  Dkt. No. 82 at 10–16. It argues that a settlement in principle between the parties means that Petitioner will not use the evidence in the DIFC, *id.* at 10–12, that there is no pending action or any action in reasonable contemplation in which Petitioner could use the requested evidence in Belgium, *id.* at 12–14, that the Dutch court is not prepared to consider the merits of Petitioner's claim or review its evidence, *id.* at 14–15, that the French proceeding is not adjudicative in nature, *id.* at 15–16, and that Section 1782 does not permit Petitioner to obtain discovery to use in other unidentified jurisdictions, *id.* at 16.

Petitioner has established that the Application seeks documents that would be "for use" in the Netherlands and France, but has not established that the documents would be "for use" in the DIFC, Belgium or other jurisdictions in which exequatur is or may be sought.  It is not necessary for the application to be granted that Petitioner demonstrate that the documents would be "for use" in all of the jurisdictions where Petitioner might use them.  "Section 1782 does not prevent an applicant who lawfully has obtained discovery under the statute with respect to one foreign proceeding from using the discovery elsewhere unless the district court orders otherwise." *Accent Delight*, 869 F.3d at 135; *see also Fed. Republic of Nigeria.*, 27 F.4th at 144.  Rather, the extent to which the Subpoenas as drafted go beyond the uses to which the documents can be put in the Netherlands and France is more properly analyzed under the fourth discretionary *Intel* factor—whether the request is unduly broad and burdensome.

Petitioner has demonstrated that at least some of the information it seeks will be "for use" in connection with the proceedings in the Netherlands. In connection with that proceeding, Petitioner will be able to use "evidence of payments between Bashneft and BOC" to establish the accuracy of Bashneft's July 8, 2022 declaration of garnishment and the inaccuracy of its September 2024 amended declaration of garnishment. Second Wiersma Decl. ¶ 12. BOC argues that the hearing the District Court of Amsterdam has scheduled for November 12, 2025 is "purely administrative," after which a hearing will be scheduled. Dkt. No. 82 at 14–15. But it does not refute that, at the later hearing, evidence of the flow of payments between Bashneft and BOC will be admissible and relevant. Petitioner has a "practical ability to inject the requested information into" the hearing and therefore satisfies the "for use" requirement for the proceedings in the Netherlands. *Accent Delight*, 869 F.3d at 132.

Petitioner also has demonstrated that information it seeks will be "for use" in the proceedings in France. Petitioner would be entitled to submit evidence of payments between Total Ratawi and BOC obtained through the Section 1782 Application to the enforcement judge at the Nanterre Judicial Court to demonstrate deficiencies in Total Ratawi's precautionary seizure declarations. Monnerville Decl. ¶ 16. Should the evidence show a history of payments from Total Ratawi to BOC, such evidence would tend to establish the need for production of the underlying documentation. *Id.* ¶ 17. Should the evidence show that Total Ratawi made inaccurate or false statements, Petitioner may be able to pursue a claim for damages in the Nanterre Judicial Court. *Id.* ¶ 18.

BOC argues that an application to compel production of documents in a post-judgment proceeding is not "adjudicative in nature." Dkt. No. 73 at 15. "[I]n order to satisfy the second statutory requirement, the applicant must seek discovery for use in an 'adjudicative' proceeding."

*Fed. Republic of Nigeria*, 27 F.4th at 148.  However, "the mere completion of an initial adjudication [does not] categorically disqualif[y] a foreign proceeding under § 1782's statutory 'proceeding' requirement."  *Id.* at 158.  And a proceeding is "adjudicative" in nature if it involves "factfinding or adjudication" by a foreign tribunal.  *Union Fenosa Gas,* 2020 WL 2793055, at *5.  Petitioner's expert declares that a summons has been issued and served on Total Ratawi to appear before the enforcement judge at the Judicial Court of Nanterre and that a proceeding will then take place where Petitioner can submit evidence to the enforcement judge.  Monnerville Decl. ¶¶ 14, 16.  That evidence satisfies the "for use" requirement as to the French proceedings.

Petitioner has not established that the requested evidence is "for use" with respect to future enforcement proceedings in the DIFC.  A proceeding must be either pending or "within reasonable contemplation" to satisfy the Section 1782 "for use" requirement.  *See Certain Funds,* 798 F.3d at 123.  Although the proceeding need not be imminent, *see Intel,* 542 U.S. at 259, "the contemplated proceeding [must be] more than just a twinkle in counsel's eye," *Certain Funds*, 798 F.3d at 124.  "[T]he applicant must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated."  *Id.* at 123.  "[T]he proceedings cannot be merely speculative."  *Id.* at 124.

Petitioner seeks discovery for use in future enforcement proceedings in the DIFC, following issuance of a deputation letter for use in enforcing the DIFC Enforcement Order in Dubai Courts.  Dkt. No. 76 at 3–4; *see* Golendukhin Decl. ¶ 4, ex. 2; Loftis Decl. ¶ 58, ex. 11.  However, Petitioner has not identified the enforcement proceedings it hopes to pursue nor affirmed that it plans to pursue enforcement proceedings.  Though Petitioner outlined the prior proceedings in the DIFC in the factual background portion of its Supplemental Memorandum of

Law, Dkt. No. 76 at 3–4, Petitioner does not present an argument that the documents would be "for use" in future or pending proceedings in the DIFC, as it provided for the proceedings in the Netherlands, France, Belgium, and "other jurisdictions," *id.* 14–17. Petitioner merely states that "enforcement proceedings are pending or imminent in . . . the DIFC," among a list of jurisdictions. Dkt. No. 76 at 15. Though prospective use of evidence need not be imminent, it cannot be "merely speculative." *BonSens*, 95 F.4th at 80–81 (quoting *Mangouras*, 980 F.3d at 101). Here, where Petitioner has provided no information as to the nature of future enforcement proceedings or its intent to bring future enforcement proceedings, the use of evidence in the DIFC is merely speculative.

Petitioner has also not established that the requested evidence is "for use" with respect to proceedings in Belgium. It is not disputed that the Belgian proceedings to challenge the accuracy, clarity, and completeness of the BPI declaration have concluded or that the three-year duration of the conservatory attachment has expired. Second Hansebout Decl. ¶¶ 4–5. There are thus no pending proceedings in Belgium. And, while Petitioner states that it might be able to use evidence of payments between BPI and BOC in a contemplated tort action in the Courts of Ghent, *id.* ¶ 6, if it obtains the evidence necessary to challenge BPI's declaration, Petitioner provides no basis for the Court to believe that such evidence exists or that there exists a theory upon which Petitioner could use it. *See In re Ativos Especiais II – Fundo de Investimento em Direitos Creditorios – NP*, 2024 WL 4169550, at * 5 (S.D.N.Y. Sept. 12, 2024) ("If there is no pending proceeding in which the evidence can be used, the applicant must 'make an objective showing that the planned proceedings were within reasonable contemplation.'") (quoting *Certain Funds*, 798 F.3d at 124). Further, Petitioner cannot use this proceeding to assess whether future litigation is possible. *Id.* (discovery is not "for use" in a proceeding "where the applicant sought

materials in order to 'investigate whether litigation is possible in the first place, putting the cart before the horse.'") (quoting *In re Certain Funds, Accts., &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC,* 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014), *aff'd,* 798 F.3d 113)).

Finally, Petitioner also argues that "asset discovery regarding payments between BOC and other entities in the Netherlands will aid in enforcement (execution) proceedings for collection" of a balance of the Award in other jurisdictions. Dkt. No. 76 at 16–17. Here, Petitioner overreaches. Although it is well-established that a Section 1782 application can be used to obtain evidence to assist in post-judgment collection proceedings, *see Fed. Republic of Nigeria*, 27 F.4th at 158; *In re Itau Unibanco S/A-Nassau Branch*, 2025 WL 918462, at *7 (S.D.N.Y. Mar. 26, 2025); *In re YS GM Marfin II LLC*, 2022 WL 624291, at *5 (S.D.N.Y. Mar. 2, 2022), and it is equally well established that a proceeding need not be imminent in order for a party to collect evidence for use in it, *see Intel*, 542 U.S. at 259; *Certain Funds*, 798 F.3d at 123, it does not follow that a judgment creditor can use Section 1782 as an all-purpose tool to hunt blindly for assets worldwide without any sense of where the assets might be located or how it might be able to use an adjudicative proceeding to collect on them. To satisfy the "for use" requirement, "a Section 1782 applicant must establish that he or she has the practical ability to inject the requested information into a foreign proceeding." *Accent Delight*, 869 F.3d at 132. Section 1782 does not permit an applicant to discover first and choose jurisdiction later. Thus, while there is no reason to doubt that petitioner would be able to benefit in collection of a judgment from using Section 1782 to discover where BOC has assets and who owes it money, that claim cannot alone satisfy the Section 1782 "for use" requirement.

### C.  Interested Person

Section 1782 permits applications by a "foreign or international tribunal" or an "interested person" in the foreign proceeding.  28 U.S.C. § 1782.  Respondent does not dispute that Mammoet is an "interested person" for the purposes of the statute.  Nor could it: as a litigant in the foreign proceedings, Mammoet is the quintessential "interested person."  "No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."  *Intel*, 542 U.S. at 256.

## II.  DISCRETIONARY FACTORS

In addition to the statutory factors, BOC argues that the application should be denied based on the discretionary factors.  It argues that the first *Intel* factor relating to whether the person from whom discovery is requested is a participant in the foreign proceeding counsels in favor of denial.  Dkt. No. 82 at 17–21.  It also argues that the Application should not be granted because the parties have reached a settlement in principle.  It does not make any other arguments under the discretionary factors.

The Supreme Court has stated that "when the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad," because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence."  *Intel* 542 U.S. at 264.  The Second Circuit has held that courts evaluating this factor should look not to the literal subpoena recipient but rather to "the real party from whom the documents are sought."  *Kiobel by Samkalden*, 895 F.3d at 245 (citing *Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 85 (2d Cir. 2004)).  "[E]verything else being equal, if the applicant can obtain the records from the party to the foreign proceeding, it should obtain them from that party."  *Ativos Especiais II*, 2024 WL 4169550, at *11; *see also id.* at *10

("A Section 1782 applicant does not strengthen its application when it seeks documents nominally from a third party when those documents are, in fact, under the control of a party.").

BOC does not argue that either it or the Correspondent Banks are participants to any foreign proceeding in which Petitioner could obtain the records Petitioner requests. Rather, it argues that the Application should be denied because BOC was a participant in the DIFC proceedings and because Petitioner could have sought discovery in the DIFC of BOC's orders, instructions and wire transfers under DIFC procedures while those proceedings were pending. Dkt. No. 82 at 19–20. The law and regulations applicable in the DIFC require a judgment debtor to attend court to provide information for the purpose of enabling the judgment creditor to enforce a judgment or order against them, but Petitioner did not initiate any application to obtain such information. Dkt. No. 83 ("Second Loftis Decl.") ¶¶ 6–7.

The Second Circuit has stated that "if it were clear that discovery were equally available in both foreign and domestic jurisdictions, a district court might rely on this evidence to conclude that the § 1782 application was duplicative, . . . or was brought vexatiously." *In re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). At the same time, however, the court also has held that "a district court may not refuse a request for discovery pursuant to § 1782 because a foreign tribunal has not yet had the opportunity to consider the discovery request," *id.*, or because the applicant must first try and fail to obtain discovery in the court where the discovery is to be used, *see Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir. 2015). "[S]uch a 'quasi-exhaustion' requirement, … 'finds no support in the plain language of the statute and runs counter to its express purposes.'" *Id.* (quoting *Metallgesellschaft,* 121 F.3d at 79).

BOC's argument would have the Court impose such a quasi-exhaustion requirement. The argument thus is without merit.

Though BOC does not raise the remaining discretionary factors under *Intel* in urging the Court to dismiss the application, the Court will evaluate those factors briefly. As to the second *Intel* factor, the nature of the foreign tribunals and the receptivity of foreign governments to U.S. federal-court judicial assistance weigh in favor of granting the application. Absent affirmative proof that a foreign court would reject evidence from a Section 1782 proceeding, "the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995). No such proof has been raised or suggested here, and in prior proceedings, French and Dutch courts have been found receptive to evidence procured through Section 1782. *In re Application of Consellior Sas*, 2017 WL 449770, at *2 (S.D.N.Y. Feb. 2, 2017) (granting § 1782 petition for discovery for use in French court); *In re Geert Duizendstraal*, 1997 WL 195443, at *2 (N.D. Tex. Apr. 16, 1997) (quoting Dutch court's approval of Section 1782 actions); *see also Euromepa S.A.*, 51 F.3d at 1101 ("Since no authoritative declarations by French judicial, executive or legislative bodies objecting to foreign discovery assistance appear in the record, we are unable to accept the district court's conclusion that granting [petitioner's] discovery request will in fact offend the people of France."). BOC has not raised any concern regarding attempts to circumvent foreign proof-gathering restrictions or other policies under the third *Intel* factor and the Court finds no evidence of attempts to circumvent foreign restrictions or policies, or policies of the United States.

The fourth *Intel* factor concerns whether the requested discovery is overly intrusive or burdensome, evaluated by applying the standards of Federal Rule of Civil Procedure 26. *Mees*,

793 F.3d at 302; *see* Fed. R. Civ. P. 26.  Under Rule 26, the scope of discovery is limited to material that is relevant to the claims and proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  Applying this standard, a Section 1782 application may be rejected as overbroad when the discovery requests call for information that goes far beyond anything that would be relevant to the foreign proceeding and are intrusive in scope.  *See In re Tel. Media Group Ltd.*, 2023 WL 5770115, at *11 (S.D.N.Y. Sept. 6, 2023) ("[A]s the party against whom the requested information will be used, Chishti has standing to object to the subpoena as overbroad."); *In re Crédito*, 2023 WL 5016497, at *9 (S.D.N.Y. May 24, 2023), *report and recommendation adopted sub nom.*, *In re Caterpillar Crédito*, 2023 WL 6938264 (S.D.N.Y. Oct. 20, 2023)); *Union Fenosa Gas,* 2020 WL 2793055, at *8 ("[W]here Egypt challenges the breadth of the sought-after discovery, as opposed to the burden it will impose on DTC, the Court finds that the challenge is properly brought."); *In re Salem*, 2024 WL 3249355, at *3 (D. Conn. July 1, 2024) ("Even though Freddy cannot claim undue burden because he is not the respondent, his standing to contest issuance of the subpoena under § 1782 as the party against whom the requested information will be used includes standing to object to the subpoena as overbroad." (citation omitted)).

As noted above, the discovery sought by Petitioner is only "for use" in the Dutch and French proceedings.  The Dutch proceedings concern transactions between Bashneft and BOC, and the French proceedings concern transactions between Total Ratawi and BOC.  Second Wiersma Decl. ¶ 12; Monnerville Decl. ¶ 16.  Petitioner's revised request demands orders, instructions or wire transfers received from *any* person or entity for the benefit or credit of BOC.  Dkt. No. 76 at 22.  This request is overbroad and would include documents irrelevant to the

Dutch and French proceedings.  Therefore, the request must be limited to orders, instructions or wire transfers related to business transactions between BOC and Bashneft or Total Ratawi.

Lastly, BOC argues that beyond the four *Intel* factors, the Court should deny the Application in its discretion due to the pending global settlement agreement.  Dkt. No. 82 at 20. Neither party asserts that the settlement agreement has been finalized.  *Id.*; Dkt. No. 76 at 15. The Court will not exercise its discretion to dismiss the Application due to a potential settlement agreement that may not be finalized.  If the settlement agreement becomes finalized in the future and Petitioner has limited need for discovery, Respondents can raise objections to the Subpoenas or move to modify them.

## CONCLUSION

For the reasons stated above, the Applications are GRANTED IN PART.  The subpoenas are modified in accordance with this Opinion as follows:

> This subpoena requires production of all documents that are responsive to the request below and are in your possession, custody or control:
> 1. Any orders, instructions or wire transfers, denominated in U.S. dollars or for which the U.S. dollar was an intermediary currency, received from Bashneft International B.V. or TotalEnergies EP Ratawi Hub for the benefit or credit of Basra Oil Company in which [the Correspondent Bank] has acted as either as direct transfer bank or as the intermediary or correspondent bank, together with any electronic and/or paper records thereof for the period beginning December 2013 to the present.

Petitioner is authorized to serve Citibank, JP Morgan, Commerzbank, Mashreqbank, Standard Chartered Bank, and MUFG with the subpoenas as modified above.

The Application is DENIED with respect to UniCredit.

The Clerk of Court is respectfully directed to close Dkt. No. 1.


SO ORDERED.

Dated: October 28, 2025
       New York, New York
                                            _____
                                                     LEWIS J. LIMAN
                                               United States District Judge